SUCCESSION OF ISAAC PIPKIN—T. J. PIPKIN, Executor—On an opposition, M. E. MURE et al.

An executor who hired out the slaves of, the succession, and, as an overseer, superintended the labor of others, is entitled to compensation for the services thus rendered, over and above the two and one-half per cent commission which the law allows.

An error in an inventory of the effects of a succession, may be corrected.

Where the testator directs, by his will, that slaves be set free, it is the duty of the executor to take care of, treat and support them, until set free, in the same manner that they were treated by the testator.

APPEAL from the Second District Court of New Orleans, *Lea*, J. *W. H. Paxton*, for the executor. *Stockton* and *Steele*, for opponents. By the court:

DUNBAR, J. This is a controversy between the heirs and legatees of *Isaac Pipkin*, deceased, and his executor, *T. J. Pipkin*, as to the settlement of his accounts in his capacity of executor.

The testator, *Isaac Pipkin*, who was the owner of a number of slaves, valued, after his death, in the inventory of his estate, at near thirty thousand dollars, died in New Orleans, in the year 1850, having made two wills or testaments, in which he gives and bequeathes to his wife and daughter, the opponents and appellants in this case, all the estate, with the exception of a female slave named *Julia Ann*, and her child, *Florence*, of whom he says: "It is my will and desire, that my slave *Julia Ann Crenshaw*, and her child, *Florence*, have their freedom, and I hereby set them free from and after my death. I beg my wife and daughter, *Mary Eleanor*, to offer no impediment to their being set free; and I beseech my wife and daughter aforesaid, to let them have their liberty, free from bondage, and grant this, my last will and request." He directs, that his slaves shall be hired out for two years after his death, at which time he gives and bequeathes them as before mentioned, and appoints *T. J. Pipkin* one of his executors, who, after having had the will aforesaid duly probated, qualified as such, and acted in that capacity until he rendered up and delivered to the legatees all the property belonging to the estate of the testator, sometime during the present year.

It appears that the deceased, for a number of years previous to his death, lived in New Orleans, and his wife and daughter, in Virginia; that his business and occupation, whilst here, was the hiring of his slaves as laborers, on the levee, in loading and discharging vessels and steamboats; and that *Thos. J. Pipkin* was employed by him for several years in the management of these slaves, in conjunction with two and, at times, three other persons, to superintend the work of some seventeen slaves or hands on the levee. It seems, that the testator, finding this a profitable business, wished it to be continued by his executor for two years after his death. In obedience to this request of the testator, his executor, who had thus been employed in the lifetime of the testator, who had resided in the same house and yard with him and his slaves, and was, moreover, his nephew, continued to live with, manage, hire out, and take care of, all the slaves, as he had done during the lifetime of the testator, under his own eye and direction.

78

The accounts of the executor, growing out of the superintendence, care and management of these slaves, are the subject of the present controversy. Three different accounts, which the parties have agreed to consider as one, have been filed by the executor in the district court, to which the legatees made various oppositions, no less than eight of which have been partially sustained by the district judge. The legatees, not satisfied with the amendments ordered by that court, in the accounts of the executor, have taken an appeal; and the appellee, likewise dissatisfied with the judgment, prays that it may be amended in various particulars, as set forth in his answer to the appeal.

The principal item of difference between the parties is the claim, made by the executor, of two thousand six hundred and thirty-five dollars, for his services as an overseer, and the services of an assistant overseer, for a period of twenty-three months, or an average of nearly $115 per month for the wages of both. The court a quo allowed only $2300, or $100 per month, and the opponents contend that nothing should have been allowed for the executor's services as overseer, beyond his commission of two and one-half per cent on the amount of the inventory.

We think that the executor should have been allowed the whole amount charged for his own and assistant overseer's services, as being very moderate and reasonable, which is satisfactorily shown by the evidence. Amongst the slaves of this succession were about twenty men, to work by the day, and their wages to be collected daily. It is shown that more than one person was required to superintend and procure work for them. There were also some ten women amongst these slaves, to be hired out; books to be kept; provisions, medicines, and clothing to be purchased, and attention to the slaves when sick, as there were about thirty-nine slaves, of all ages, belonging to the succession. No stronger evidence of the fidelity, energy, and good management of this executor, can be required, than the fact, which is exhibited in his accounts, that, in the period of two years, he received from the hire of these slaves the almost incredible amount of $16,538 44, of which amount, he transmitted to the heirs and legatees the sum of $9435.

Nor do we consider that there is any well founded legal objection to the claim of the executor for his wages as an overseer, in addition to his commission of two and one-half per cent on the amount of the inventory. It surely could not have been reasonably expected, if the executor had been a baker or butcher, that he would have furnished bread or meat to these slaves for years without charge, nor can it, with any more reason, be expected that he should have devoted his days and nights as an overseer, to the hiring out of these slaves on the levee, living with them, taking care of them, and managing them, so as to make for the heirs and legatees the enormous profits before mentioned. We do not think that the rule established in the case of *Baldwin's Executor* v. *Carleton*, 15 L. R. 399, "that a professional man, who is an executor, and renders legal services to the estate he administers, is not entitled to any separate compensation," is applicable to the present case, and would be carrying the doctrine further than we are disposed to carry it.

The district judge, we think, erred in another item, in ordering the " account to be amended by charging the executor with the sum of $401 70, the difference between the alleged balance of cash on hand and that shown in the inventory."

The testator died on the 20th January, 1850 ; his wills were probated on the 16th February, 1850, and the inventory was taken on the 26th of March following-

ing, in which it was stated, that there was $1000 cash on hand. In the accounts rendered by the executor, he credits the estate regularly, day by day, with sums of money received for the estate, from the 21st of January, 1850, to the close of his administration, amounting to $17,132 44. It will be found, that up to the 26th March, 1850, the estate is credited with $1536 90, as so much cash received. The auditor appointed in this cause reports also this fact, and that, up to that date, the executor had paid out $938 61; showing that, in fact, the executor had really in hand at the time of taking the inventory, a balance of only $598 29. The amounts making $938 61, appear, by different vouchers, in the debit side of the account. And this being the true state of facts, as exhibited by the books of the executor, offered in evidence by both parties, it becomes a matter of indifference whether the amount was stated correctly or not at the time of taking the inventory. It is true, the object of the inventory is to ascertain the state of the property at the time of its being taken; but, it cannot be seriously contended, that an error therein cannot be rectified by evidence. It is here shown that there did exist such an error, which, there can be no doubt, arose from the executor having, for more than two months before the taking of the inventory, received and paid out monies for the estate, and his accounts not being then made up, the cash on hand was stated at an approximation. The true cash on hand is now ascertained by evidence, and it has all been credited. Therefore, the judgment of the district court, charging the executor with $401 70, the difference between the alleged balance of cash on hand and that shown by the inventory, must be corrected. 4 R. R. 278, *Babin* v. *Noland* and 5 Ann. 550, *Derouin* v. *Segura:*

We consider that there is error in charging the executor with $150, the difference between the inventoried price of the horses of the succession, and the amount for which they were sold by the executor. He was directed by the heirs and legatees to sell them at private sale, with as little expense as possible; which he did, and has accounted for the proceeds thereof.

There is also another amendment to the account of the executor, ordered by the district judge, which should be corrected. He charges the executor with $305, for the board, lodging and clothing of the emancipated slave, *Julia Ann*, and her daughter, *Florence*.

It is shown that the executor permitted them to remain in the house of the deceased, with the other slaves, where the executor himself resided, and that he supported and took care of them, in the same manner that they had been treated by the testator in his lifetime. This could have added but little to the expense of the whole establishment, (consisting of about thirty-nine slaves,) and we think that, until their emancipation could be effected, it was the duty of the executor to retain them in his possession and treat or manage them in the same manner in which they had been treated by their deceased master. We are of the opinion, that this was required of the executor, both by duty and the ordinary dictates of humanity; and it is by no means to the credit of the heirs and legatees, that they should complain of it.

The account of the executor, amended in conformity to this opinion, as hereinbefore stated, will exhibit a final balance of $3968 53 in his favor. The district judge has allowed to the executor, by his judgment, $1191 70 less than this amount, but has failed to give him a judgment against the heirs and legatees for the amount due to him from them.

It is therefore ordered, that the judgement of the district court be reversed; that the account of the executor, amended in conformity to this opinion, be con-

firmed and homologated, and that he recover of the aforesaiad heirs and lega-
tees, the sum of $3968 53, with interest at five per cent per annum from the
8th of May, 1852, until paid, and the costs in both courts to be paid by the heirs
and legatees.